UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KAREN GRAY,

                          Plaintiff,

          -vs-                         **No. 1:13-CV-00955 (MAT)**
                                       **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                        Defendant.

---

**I.    Introduction**

Represented by counsel, Karen Gray ("plaintiff") brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, the Commissioner's motion is granted.

**II.    Procedural History**

The record reveals that on April 19, 2010, plaintiff protectively filed an application for DIB, alleging disability beginning April 15, 2010. After this application was denied, plaintiff requested a hearing, which was held before administrative law judge Stanley A. Moskal, Jr. ("the ALJ") on September 19, 2011, with plaintiff appearing *pro se*. The ALJ issued an unfavorable

decision on December 15, 2011. The Appeals Council denied review of that decision. This timely action followed.

**III. Summary of the Evidence**

    **A.    Plaintiff's Reports**

Plaintiff, who was 46 years old on the alleged onset date of April 15, 2010, was laid off from her job as a data entry clerk on May 15, 2008. This job, which plaintiff held for three years, involved frequent sitting and lifting of less than 10 pounds. Upon applying for DIB, plaintiff reported that she was unable to work due to sarcoidosis (a growth of inflammatory cells). In a June 1, 2010 statement of ADLs, plaintiff reported that she was able to prepare meals three times per week, shop for groceries, manage money, and do yard work occasionally. She also stated that she was able to do most regular activities and chores, but at a slower pace. Plaintiff testified that she was able to stand and walk for 30 minutes while at the grocery store, typically stands while washing dishes, and was able to sit and watch a one-hour television program.

Plaintiff testified that she had problems with her vision and that she could therefore not drive in the rain, but that she "had glasses now . . . and it's made a huge difference." T. 433. Plaintiff testified to a history of migraines, but stated that recently they had been less frequent and less severe. She also stated that she experienced "fatigue and tremors," that her "eyes

2

[got] tired very fast," and that she experienced "shortness of breath." T. 432. Plaintiff testified that she experienced back spasms "[w]henever [she tried] to exercise or . . . [tried] to move things." T. 435. She reported that at the time of the hearing, she was five feet, six inches tall and weighed 227 pounds.

B.   **Treating Sources**

The record contains treatment records from several sources. In May 2010, Dr. Polina Purizhansky recorded that plaintiff reported back pain and had a decreased range of motion of the lumbar spine, but the doctor otherwise noted an essentially normal physical exam and negative neurological findings. T. 597-98. Plaintiff saw pulmonologist Dr. Sherif Sherif on June 10, 2010, in follow-up regarding back pain. Dr. Sherif noted an essentially normal physical exam, and continued plaintiff on Prednisone for her pulmonary sarcoidosis. T. 595-96. Dr. Sherif referred plaintiff to neurology for a consultation regarding tremors. On June 14, 2010, Dr. Purizhansky reported another normal physical exam, although plaintiff reported symptoms of chest pain and headaches. T. 593-94.

Dr. Michael Battaglia examined plaintiff to evaluate her tremor on June 18, 2010. T. 652-53. Dr. Battaglia concluded that plaintiff was "either suffering from essential tremor or potentially an anxiety disorder that [was] making her feel tremulous." T. 652. His examination revealed "no significant tremor," and he noted that her "neurologic exam [was] pristine

3

without focal deficits." Id. He reassured plaintiff that she was "not suffering from a significant, serious, or worrisome central or peripheral nervous system disorder." Id.

Medical records reflect treatment by Dr. Sherif through June 2011. T. 665-743. In August 2010, a pulmonary x-ray ordered by Dr. Sherif revealed pulmonary sarcoidosis, with bilateral hilar enlargement, and normal heart size. Dr. Sherif noted that this result had been seen previously. Dr. Sherif reported to Dr. Purizhansky that plaintiff exhibited no sign of cardiac sarcoid disease, and no evidence of a cardiomyopathy or a conduction system disease. Also in August 2010, a pulmonary function analysis interpreted by Dr. Nashat Rabad revealed normal findings, except for "moderately reduced" diffusion capacity. T. 702. In September 2010, Dr. Sherif noted that there had been "little change" in his findings since previous examinations in August 2010 and August 2006. T. 740; see T. 690-91.

In October 2010, Dr. Donald Switzer reported to Dr. Purizhansky that plaintiff was not suffering from palpitations. Her physical examination was normal. He also noted that he anticipated that her supraventricular tachycardia "will be permanently cured, and the chance of recurrence [was] only about 1%." T. 686. Also in October 2010, Dr. David Rodman, opthalmologist, reported that plaintiff had a history of sarcoid disease "manifested primarily ophthalmologically as a primary

4

vitreitis," (inflammation of cells). T. 688. Plaintiff took medication in the form of eye drops for her condition, and her "best corrected visual acuity [was] typically [in] the 20/25 to 20/40 range." Id. Dr. Rodman noted that he would continue to treat plaintiff and continue eye drops.

Dr. Sherif noted an essentially normal physical exam in January 2011. He also noted that her "[r]espiratory status [was] stable." T. 685. In February 2011, Dr. Sherif again noted similar findings to August 2010 and August 2006 findings. Dr. Sherif recorded that plaintiff's pulmonary status and chest x-ray were stable, and recommended that plaintiff follow up with Dr. Rodman for eye problems. A May 2011 cardiac stress test ordered by Dr. Sherif and interpreted by Dr. William Morris noted sinus tachycardia and one episode of palpitations in a 24-hour period.

Dr. Rodman noted in February 2011 that plaintiff had made changes to her Prednisone doseage (without the advice of a doctor) and had "occasionally been less than compliant with visits and has had a difficult time affording the nonsteroidal anti-inflammatory drop" that he had prescribed for her eye condition. T. 682. Dr. Rodman prescribed an increased doseage of Prednisone and advised plaintiff to take her eye drops as prescribed. On follow-up in March 2011, plaintiff had resumed taking prescribed medications and showed vast improvement. Dr. Rodman noted 20/60 vision in the right eye and 20/40 vision in the left eye, as well as a "total

absence of the severe macular edema that was present several weeks ago." T. 678. Two weeks later, Dr. Rodman noted that plaintiff's "vision [was] stable." T. 676. In May 2011, Dr. Rodman again noted stable vision and recommended that plaintiff's eye condition continue to be managed with a low dose of Prednisone.

In April 2011, Dr. Morris noted an essentially normal physical exam, but noted that plaintiff reported palpitations. Dr. Morris opined that these palpitations were likely not due to any cardiac problem, and speculated that they might be related to weight gain, steroid myopathy, or pulmonary sarcoid. In May 2011, Dr. Morris noted moderate obesity, found no evidence of cardiac disease, and recommended that plaintiff begin a restricted calorie low-fat diet and a regular low level of exercise. He made no changes to her medications. In June 2011, Dr. Sherif noted that plaintiff reported chest pain, but denied any other symptoms including shortness of breath. Physical exam was normal, and Dr. Sherif continued a diagnosis of pulmonary sarcoidosis but noted again that the condition was stable.

On September 9, 2011, Dr. Purizhansky completed a medical source statement of ability to do work-related activities (physical). T. 788-93. Dr. Purizhansky opined that plaintiff could occasionally lift up to 20 pounds; occasionally carry up to 10 pounds; sit for eight hours, stand for 15 minutes, and walk for five minutes in an eight hour workday; reach overhead and push/pull

6

with both hands occasionally; reach other than overhead, and handle, feel, and finger objects continuously (however, Dr. Purizhansky noted weakness and tiredness with pushing and pulling); climb stairs, ramps, ladders and scaffolds occasionally; kneel, crouch, and crawl frequently; and balance and stoop continuously. Dr. Purizhansky also opined that plaintiff could occasionally tolerate dust, odors, and fumes; frequently tolerate unprotected heights, moving mechanical parts, and operating a motor vehicle; and continuously tolerate humidity and wetness, extreme cold or heat, and vibrations. Regarding ADLs, Dr. Purizhansky noted that plaintiff could perform all of the listed categories except that she could not "walk a block at a reasonable pace on [a] rough or uneven surface[]." T. 793.

**C. Consulting Sources**

Dr. Kathleen Kelley completed an internal medicine examination, at the request of the State agency, on June 7, 2010. T. 576-85. Dr. Kelley noted an essentially normal physical examination, and diagnosed the following: ocular and pulmonary sarcoid; non-specific back spasms (although Dr. Kelley noted that plaintiff reported she last experienced these one month ago and was "fine now"); migraines, by history; palpitations, by history, without associated chest pain; and right inguinal herniorrhaphy. The only limitation noted by Dr. Kelley was that plaintiff should

7

"refrain from smoke and respiratory irritants, extremes of temperature, high humidity, and exertion." T. 579.

On June 29, 2010, single decision maker ("SDM") G. Grabow completed a physical residual functional capacity ("RFC") assessment. T. 445-49. He concluded that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand, stand, and/or walk for about six hours in an eight-hour workday; and push and/or pull to an unlimited extent. He also noted various environmental and visual limitations.

**IV. Scope of Review**

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Social Security Act ("the Act"), the district court is limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for

8

substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

**V.   The ALJ's Decision**

The ALJ followed the well-established five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520. Initially, the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2013. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since April 15, 2010, the alleged onset date. At step two, the ALJ found that plaintiff had the following severe impairments: ocular and pulmonary sarcoidosis, history of back spasms, history of migraines, obesity, intermittent sinus tachycardia, history of right inguinal hernia, and intermittent hand tremors.

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. At step four, the ALJ found that plaintiff retained the RFC to perform her past relevant work as a bookkeeper, data entry clerk, and law office assistant. The ALJ alternatively determined, at step five, that, considering plaintiff's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that

plaintiff could perform. In making his RFC findings, the ALJ conducted a thorough review of the medical evidence, which includes treatment notes from various providers as well as consultative examinations. The ALJ also reviewed plaintiff's testimony and her own reports of her symptoms and activities of daily living ("ADLs"). The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements regarding the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC assessment. Based on the above, the ALJ concluded that plaintiff was not disabled during the relevant time frame.

**VI. Discussion**

    **A. Weight Given to Medical Opinions**

Plaintiff contends that the ALJ failed to properly weigh the medical opinions. In his decision, the ALJ gave "some" weight to he opinions of treating physician Dr. Purizhansky and consulting physician Dr. Kelley. The ALJ gave "significant" weight to the opinion of SDM Grabow. Specifically, plaintiff contends that the ALJ erred in failing to give controlling weight to Dr. Purizhansky's opinion that plaintiff could not stand for more than 15 minutes or walk for more than five minutes in an eight-hour workday. Plaintiff also argues that the ALJ erred in giving significant weight to the non-medical opinion of SDM Grabow.

10

### 1. Treating Physician's Opinion

The ALJ rejected the portion of Dr. Purizhansky's opinion which found significant standing and walking restrictions, stating that these opinions were "incredulous and not supported by the physician's own treatment records," finding that these extreme limitations "suggest[ed] that [Dr. Purizhansky] likely did not read or complete that portion of the questionnaire carefully." T. 419.

The treating physician rule provides that an ALJ must give controlling weight to a treating physician's opinion if that opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with other substantial evidence in the record. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. § 404.1527(c)(2). The Court agrees with the ALJ, however, that Dr. Purizhansky's assessment of plaintiff's walking and standing limitations was not supported by substantial record evidence. Indeed, the Court notes that these limitations do not even appear to be consistent with the remainder of Dr. Purizhansky's functional assessment, which also found, for example, that plaintiff could kneel, crouch, and crawl frequently, and that she could continuously balance and stoop. Dr. Purizhansky's treatment records also consistently reported normal physical examinations, with no problems in standing or walking noted. Additionally, as discussed above, treatment records

from other sources similarly indicated consistently normal physical examinations.

The ALJ was within his discretion to accept certain portions of Dr. Purizhansky's opinion, but reject those that were not supported by her own treatment notes or other substantial record evidence. See Pavia v. Colvin, 2015 WL 4644537, at *4 (W.D.N.Y. Aug. 4, 2015) (noting that it is "within the province of the ALJ to credit portions of a treating physician's report while declining to accept other portions of the same report") (citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)).

### 2. Single Decision Maker's Opinion

Plaintiff contends that the ALJ erred in giving significant weight to the opinion of the state agency reviewer, SDM Grabow. The Court finds that the ALJ did err in giving weight to the opinion of the state agency reviewer, who was not a medical professional. See Martin v. Astrue, 2012 WL 4107818, *15 (N.D.N.Y. Sept. 19, 2012) ("Numerous courts have concluded, per [a memorandum from the Chief ALJ for the Social Security Administration], that assigning any evidentiary weight to an SDM's opinion is an error.").

However, plaintiff "has not demonstrated that he was prejudiced by the . . . weight afforded this opinion." Id. at *16. The record establishes that plaintiff had consistently normal physical examinations, and that her pulmonary sarcoidosis condition had not changed significantly since 2006, well before her April

12

2010 alleged onset date. See T. 740. Additionally, plaintiff's eye condition was well-controlled when she complied with prescriptions. Plaintiff also reported various ADLs, as the ALJ noted, including walking for up to 30 minutes at a time and doing basic household chores. Considering all of the medical evidence in combination with plaintiff's own reports, the ALJ's RFC assessment was supported by substantial evidence, regardless of the weight he gave to the opinion of the SDM. See Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 35 (2d Cir. 2013) (finding no reversible error where ALJ assigned "substantial weight" to state agency reviewer's opinion, where it was "supported by the remainder of the record"); Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (remand unnecessary where "application of the correct legal principles ... could lead only to the same conclusion").

**B. The ALJ's Duty to Develop the Record**

Plaintiff contends that the ALJ failed to develop the record, by failing to contact Dr. Purizhansky for clarification regarding her opinion, and by failing to contact plaintiff's other treating sources for opinions.

Although an ALJ has an affirmative duty to develop the record where the basis of a treating physician's opinion cannot be discerned (see, e.g., Jackson v. Barnhart, 2008 WL 1848624, *8 (W.D.N.Y. Apr. 23, 2008)), or where clarification as to the opinion is necessary (see, e.g., Hart v. Colvin, 2014 WL 4904810, *14

13

(E.D.N.Y. Sept. 30, 2014)), such circumstances did not exist here. As the Commissioner notes, Dr. Purizhansky's opinion regarding plaintiff's limitations was quite clear. Dr. Purizhansky completed the medical source statement in full, and the portion which the ALJ rejected, finding that plaintiff was limited to standing 15 minutes and walking five minutes in an eight-hour workday, provided a concise estimate of plaintiff's limitations. As discussed above, the ALJ was within his discretion to reject this portion of the opinion because it was inconsistent with Dr. Purizhanky's treatment notes and with the record as a whole. "[W]here, as here, the particular treating physician's opinion that is at issue is unsupported by any medical evidence and where the medical record is otherwise complete, there is no duty to recontact the treating physician for clarification." Ayers v. Astrue, 2009 WL 4571840, *2 (W.D.N.Y. Dec. 7, 2009).

Regarding plaintiff's contention that the ALJ should have contacted plaintiff's other treating sources for medical source statements, the Court notes, initially, that the ALJ *did* contact Dr. Sherif (plaintiff's treating pulmonologist) for such a statement; however, Dr. Sherif did not provide one. See T. 665-66. Moreover, as the Commissioner points out, the record reveals continuous correspondence between plaintiff's other treating sources and Dr. Purizhansky, and therefore Dr. Purizhansky's opinion reflected a full assessment considering her knowledge of

14

plaintiff's entire treatment regimen. The ALJ did not have a duty to contact each of plaintiff's treating sources for opinions, where he had an opinion from plaintiff's primary treating physician, full treatment notes from all of plaintiff's treating sources, and the medical record was otherwise complete. See Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) (holding that ALJ had no duty to contact treating source for statement, even where ALJ had *no* opinions from treating sources, where ALJ's RFC finding was consistent consulting examiner's findings) (citing Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information[.]") (internal quotation marks omitted).

## C. Credibility

Plaintiff contends that the ALJ erred in assessing her credibility. In his decision, the ALJ considered plaintiff's statements regarding her symptoms and limitations, in some cases actually crediting her reports (e.g., plaintiff stated that she had been to the grocery store and walked around for approximately 30 minutes). The ALJ's discussion of plaintiff's testimony (see T. 415) is quite thorough and is accompanied by a review of the medical evidence. In the context of his discussion of the record,

15

the ALJ cited, among other sources, 20 C.F.R. § 416.929 and SSR 96-7p.

The ALJ's discussion, which incorporates his review of the testimony, indicates that the ALJ used the proper standard in assessing credibility, especially in light of the fact that the ALJ cited relevant authorities in that regard. See Britt v. Astrue, 486 F. App'x 161, 164 (2d Cir. 2012) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96-7p as evidence that the ALJ used the proper legal standard in assessing the claimant's credibility); Judelsohn v. Astrue, 2012 WL 2401587, *6 (W.D.N.Y. June 25, 2012) ("Failure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record."). The ALJ's conclusion that plaintiff's reports were not credible because they were inconsistent with substantial record evidence was thus based on a proper application of the law and is supported by substantial record evidence.

D. **Failure to Consider Obesity**

Plaintiff contends that the ALJ failed to properly consider the effects of her obesity on her functional limitations. The ALJ did find that plaintiff's obesity was a "severe" impairment, but did not specifically address the effects of plaintiff's obesity on her limitations in his ensuing discussion. The record, however,

16

does not indicate that plaintiff's obesity constituted a significant limiting factor regarding her ability to do work. Although obesity is mentioned as a diagnosis within treatment records, and there are intermittent references to the need for diet and exercise, the treatment records and Dr. Purizhansky's opinion do not indicate that obesity was considered significant relative to plaintiff's ultimate ability to do work. See Thompson v. Astrue, 2013 WL 265239, *3 (W.D.N.Y. Jan. 23, 2013) (notwithstanding clear evidence of claimant's obesity, ALJ has no duty to consider obesity as an impairment or a contributing factor where record is "devoid of any suggestion that her weight negatively impacted her ability to work.").

In any event, to the extent that plaintiff's symptoms or limitations were related to obesity, this was adequately considered by the ALJ in his RFC finding, which limited plaintiff to lifting and carrying five pounds frequently and 20 pounds occasionally, and pushing and pulling 20-pound objects occasionally. This RFC assessment was consistent with Dr. Purizhansky's opinion and adequately incorporated her note that plaintiff experienced "weakness and tiredness" with pushing and pulling. The fact that the ALJ did not explicitly discuss plaintiff's obesity is not determinative. See Drake v. Astrue, 443 F. App'x 653, 657 (2d Cir. 2011) ("[T]he ALJ implicitly factored [plaintiff]'s obesity into his RFC determination by relying on medical reports that repeatedly

17

noted [] obesity and provided an overall assessment of her work-related limitations.").

## VI. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Doc. 10) is granted, and plaintiff's cross-motion (Doc. 14) is denied. The ALJ's finding that plaintiff was not disabled is supported by substantial evidence in the record, and accordingly, the Complaint is dismissed in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**S/Michael A. Telesca**
_____
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     August 20, 2015
           Rochester, New York.